IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HEATHER LYNN LOVE | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  20-5221 |
| Commissioner of Social Security[1] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                  September 27, 2021

Heather Lynn Love ("Plaintiff") seeks review of the Commissioner's decision denying her application for disability insurance benefits ("DIB").  For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence and remand for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on September 13, 2018, tr. at 173, alleging that she became disabled on February 3, 2018, as a result of endometriosis, fibromyalgia, depression, anxiety, post-traumatic stress disorder ("PTSD"), headaches, thyroid disease, arthritis of both knees, and gastroesophageal reflux disease ("GERD").  Id. at 174, 201.[2]

---

[1]Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms. Kijakazi should be substituted for the former Commissioner of Social Security, Andrew Saul, as the defendant in this action.  No further action need be taken to continue this suit pursuant to section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).

[2]Plaintiff filed a prior application that was denied at the initial review level on October 23, 2013, and Plaintiff did not seek further review.  Tr. at 198.

Plaintiff's application for benefits was denied initially, id. at 116-20, and she requested a

hearing before an ALJ, id. at 121-22, which took place on November 6, 2019.  Id. at 38-

67.  On November 27, 2019, the ALJ found that Plaintiff was not disabled.  Id. at 17-31.

The Appeals Council denied Plaintiff's request for review on September 14, 2020, id. at

1-3, making the ALJ's November 27, 2019 decision the final decision of the

Commissioner.  20 C.F.R. § 404.981.

     Plaintiff commenced this action in federal court on October 20, 2020, Doc. 1, and

the matter is now fully briefed and ripe for review.  Docs. 11 & 14.[3]

## II.   <u>LEGAL STANDARD</u>

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than 12

months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner employs a five-step process,

evaluating:

> 1.    Whether the claimant is currently engaged in
> substantial gainful activity;
>
> 2.    If not, whether the claimant has a "severe
> impairment" that significantly limits her physical or mental
> ability to perform basic work activities;

---

For DIB eligibility, a claimant must establish disability on or before his or her date
last insured.  See 20 C.F.R. § 404.101(a); <u>Matullo v. Bowen</u>, 926 F.2d 240, 244 (3d Cir.
1990).  Because Plaintiff's date last insured for purposes of DIB is December 31, 2022,
<u>tr.</u> at 98, she need only establish disability to be entitled to DIB.

[3]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c).  <u>See</u> Standing Order, In RE:  Direct Assignment of Social Security Appeal
Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 5.

3.     If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

4.     If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

5.     If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§ 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the

burden shifts to the Commissioner at the fifth step to establish that the claimant is capable

of performing other jobs in the local and national economies, in light of her age,

education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88,

92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusion that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552

(3d Cir. 2005)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

## III.    DISCUSSION

### A.    ALJ's Findings and Plaintiff's Claims

The ALJ found that Plaintiff suffered from the severe impairments of fibromyalgia,[4] thyroid dysfunction, and mood disorder.  Tr. at 19.   In addition, the ALJ found that Plaintiff suffers from the non-severe impairments of asthma, esophageal dysphasia, osteoarthritis of her knees, endometriosis, bladder symptoms, migraines, GERD, insomnia, and irritable bowel syndrome ("IBS").  Id. at 19-21.  The ALJ next found that Plaintiff did not have an impairment or combination of impairments that met the Listings, id. at 21, and that Plaintiff retained the RFC to perform light work with no detailed instructions, no temperature extremes, and no excessive pollutants.  Id. at 22. The ALJ then found that Plaintiff could not perform her past relevant work as a customer service representative, hairdresser, or a banking customer service representative.  Id. at 29-30.  Finally, based on the testimony of a vocational expert ("VE"), the ALJ found that jobs exist in significant numbers in the national economy that Plaintiff could perform, including bench assembler, visual inspector, and hand packager, resulting in the ALJ's ruling that Plaintiff was not disabled.  Id. at 30-31.

---

[4]As will be discussed, the medical record is not definitive as to the diagnosis of fibromyalgia, but the symptoms are documented in the medical record and may be caused by other diagnosed medical conditions.  The ALJ addressed this in his decision.  See tr. at 24-25.

Plaintiff claims that the ALJ erred in failing to (1) properly weighing the opinions of Plaintiff's treating sources, and (2) consider the limitations imposed by Plaintiff's severe impairments and other impairments reflected in the record.  Doc. 11 at 1-2, 6-25.[5] Defendant responds that the ALJ's determination is supported by substantial evidence, the RFC assessment accommodates all of Plaintiff's credibly established limitations, and the ALJ's assessment of the opinion evidence is consistent with governing regulations. Doc. 14 at 3-8.

**B.      Plaintiff's Claimed Limitations**

Plaintiff was born on May 1, 1982, making her 36 years old at the time of her application and 37 years old at the time of the ALJ's decision.  Tr. at 174.  She completed high school and at the time of the administrative hearing was trying to take classes at community college.  Id. at 42.

At the administrative hearing, Plaintiff explained that she suffers from PTSD arising from abuse she has suffered throughout her life, starting when she was three years old.  Tr. at 44-45.  As a result, she suffers from nightmares and has flashbacks two or three times a week triggered by stress, violence, and arguments.  Id. at 46.  She also suffers from panic attacks where her chest "cav[es] in," her body shakes and she has trouble breathing, and crying spells.  Id.  at 46, 48.  Plaintiff also complained about having no energy, feeling exhausted and continually sleepy, paranoia, confusion,

---

[5]I have reordered Plaintiff's claims for ease of discussion.

forgetfulness, difficulty concentrating and maintaining focus, insomnia and racing thoughts.  Id. at 46-49.

Plaintiff explained that she sends her youngest children, ages three and five, to daycare because she is unable to keep up with them.  Tr. at 49-50.[6]  The pain caused by her fibromyalgia is throughout her body, worse in her neck, back, legs and arms.  Id. at 51.  In addition, she has trouble holding things in her hands, resulting in dropped dishes and broken glasses.  Id. at 52.  According to Plaintiff she can walk a block or two before suffering a feeling of pins and needles in her feet and legs and stabbing pain in her knees.  Id. at 59.  She can sit for about twenty minutes before she feels tightness and pins and needles in her buttocks, legs, and knees, and stand for about fifteen minutes.  Id. at 59-60.  With respect to lifting and carrying, Plaintiff testified that she cannot carry the laundry from the second floor to the basement and cannot carry a bag of potatoes "for very long."  Id. at 60.  In addition, bladder spasms are associated with periods of pain and vomiting and once or twice a week, when she is unable to get out of bed.  Id. at 55-56.

Plaintiff's endometriosis causes her difficulty in toileting and she suffers from IBS, causing bouts of diarrhea three days a week.  Tr. at 54.  Plaintiff also suffers from headaches, which she described as debilitating migraines a year before the administrative hearing, but more like tension headaches in the year prior to the hearing.  Id. at 56.  She suffers from daily jitteriness, increased bowel movements, excessive sweating, and palpations caused by either her thyroid problem or anxiety.  Id. at 58.

---

[6]Plaintiff also has three other children, one was twelve years old and two who were eighteen years old at the time of the administrative hearing.  Tr. at 41, 56.

C.      **Summary of the Medical Record**

On February 6, 2018, Plaintiff reported to her primary care physician Luciano

Migliarino, M.D., that she continued to have "intermittent significant abdominal pain" on

gabapentin[7] after undergoing a hysterectomy to address endometriosis.  Tr. at 472-73.[8]

Dr. Migliarino prescribed Cymbalta[9] to address Plaintiff's depression and anxiety, noted

Plaintiff's migraine condition was well controlled, and her asthma was stable on

medication.  Id. at 474.  Three weeks later, Plaintiff reported "feeling a little better" on

her current dosage of Neurontin for her endometrial pain, and the doctor increased

Plaintiff's Cymbalta and provided a referral to psychiatry for Plaintiff's depression and

anxiety and another for rheumatology to address Plaintiff's myalgias and arthralgias.  Id.

at 475-76.  In April 2018, Dr. Migliarino noted that rheumatologist Nancy Walker, M.D.,

recently evaluated Plaintiff and diagnosed her with fibromyalgia.[10]  Id. at 477.  Dr.

---

[7]Gabapentin (brand name Neurontin) is an anticonvulsant used to treat partial
seizures and also to treat nerve pain.  See https://www.drugs.com/gabapentin.html (last
visited Sept. 8, 2021).

[8]The administrative record also contains the treatment notes from Gerald Harkins,
M.D., Plaintiff's gynecologist, documenting chronic pelvic pain and endometriosis, the
hysterectomy she underwent in June of 2017, and her post-operative progress predating
her alleged disability onset.  Tr. at 329-74, 947.

[9]Cymbalta (generic duloxetine) is an antidepressant used to treat major depressive
disorder ("MDD"), general anxiety disorder, and to treat nerve pain or chronic muscle or
joint pain.  See https://www.drugs.com/cymbalta.html (last visited Sept. 8, 2021).

[10]Fibromyalgia is pain and stiffness in the muscles and joints that either is diffuse
or has multiple trigger points.  Dorland's Illustrated Medical Dictionary, 32nd ed. (2012)
("DIMD"), at 703.
        Dr. Migliarino's reference to fibromyalgia is confusing because Dr. Walker's
diagnoses assigned on March 13, 2018, do not include fibromyalgia, but do include

7

Migliarino's notes also indicate that psychiatrist Franklin De Guzman, M.D., added Wellbutrin and trazodone[11] to her treatment regimen, and that an ultrasound of her thyroid found two small left thyroid nodules.  Id. at 478-79; see also id. at 463, 653, 982 (indicating addition of Wellbutrin and trazodone on April 17, 2018).

Dr. Walker at the Arthritis & Osteoporosis Center initially saw Plaintiff on March 13, 2018, and diagnosed her with mild patellafemoral degenerative joint disease of both knees, various muscle pain, pain in the thoracic spine and low back, and Sjogren's syndrome.  Tr. at 571-72.  On April 10, 2018, Plaintiff saw Susan Durkin, D.N.P, at Arthritis & Osteoporosis Center, who repeated the diagnoses made by Dr. Walker.  Id. at 379-80, 615.  However, Ms. Durkin noted that the blood work completed since Plaintiff saw Dr. Walker made any inflammatory/autoimmune disease unlikely.  Id. at 379, 615.

On April 17, 2018, Dr. De Guzman of Berkshire Psychiatric & Behavioral Health Services ("Berkshire Psychiatric") conducted an initial psychiatric evaluation and determined that Plaintiff had recurrent episodes of depression with anxiety and a problem

---

Sjogren's syndrome, an autoimmune disorder characterized by dry eyes and dry mouth, with accompanying symptoms of joint pain, swelling and stiffness, swollen salivary glands, skin rashes, vaginal dryness, persistent dry cough, and prolonged fatigue.  Tr. at 572; see also https://www.mayoclinic.org/diseases-conditions/sjogrens-syndrome/symptoms-causes/syc-20353216 (last visited Aug. 31, 2021).

[11]Wellbutrin (generic bupropion) is an antidepressant.  See https://www.drugs.com/wellbutrin.html (last visited Sept. 8, 2021).   Trazodone is an antidepressant used to treat MDD.

with her temper.  Tr. at 468.[12]  On Mental Status Examination ("MSE"), the doctor noted that her mood was depressed, affect restricted, and she had some compulsive features.  Id. at 467.  In a letter dated April 23, 2018, Dr. De Guzman diagnosed Plaintiff with MDD, recurrent, moderate, without psychotic features, and possible PTSD.[13]  Tr. at 470. During his initial evaluation, therapist James Miller, L.C.S.W., found that Plaintiff had depressed/anxious mood, pressured speech, excessive motor activity, and found that Plaintiff's concentration and attention were distractible.  Id. at 461.  Mr. Miller diagnosed Plaintiff with MDD and rule out diagnoses of PTSD and panic disorder,[14] and assessed a Global Assessment of Functioning ("GAF") score of 58.[15]  Id. at 462, 652, 981.

---

[12]Dr. De Guzman noted a history of fibromyalgia, but it appears that was based on Plaintiff's report.  Tr. at 466.  Many of the Berkshire Psychiatric records are duplicated two and three times in the medical record.  I will cite to just one of the copies.

[13]The essential feature of MDD is a clinical course that is characterized by one or more major depressive episodes.  Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2013) ("DSM 5"), at 160-61.  A major depressive episode is a period of at least two weeks during which there is either depressed mood or the loss of interest or pleasure in nearly all activities. Id. at 163.  "The essential feature of [PTSD] is the development of characteristic symptoms following exposure to one or more traumatic events." DSM 5 at 274. The clinical presentation can be predominated by fear-based re-experiencing, emotional, and behavioral symptoms, anhedonic or dysphoric mood states and negative cognitions; arousal and reactive-externalizing symptoms; and/or dissociative symptoms. Id.

[14]"Panic disorder refers to recurrent unexpected panic attacks. . . .  A panic attack is an abrupt surge of intense fear or intense discomfort that reaches a peak within minutes, and during which time four or more of a list of 13 physical and cognitive symptoms occur." DSM 5 at 209.

[15]A GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health.  Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM IV-TR"), at 34.  A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial

On April 27, 2018, while being seen at the Reading Hospital Emergency Department for a fall, Plaintiff reported suicidal thoughts, lack of sleep, and weight loss. Tr. at 673.  Arrangements were made for inpatient treatment, id., and the next day Plaintiff was admitted to Brooke Glen Behavioral Hospital ("Brooke Glen"), for complaints of anxiety, depression, and feeling overwhelmed. Id. at 400-03.[16]  After increasing Plaintiff's Cymbalta, and continuing her Neurontin for chronic pain, and increasing trazodone for sleep, Plaintiff was discharged on May 3, 2018, with diagnoses of MDD, recurrent, severe, and cannabis use disorder, moderate. Id. at 401-02.  Mr. Miller at Berkshire Psychiatric saw Plaintiff about ten days later and noted that after her discharge Plaintiff had a panic attack and visual hallucinations and flashbacks regarding a shooting and earlier sexual abuse. Id. at 645.  Mr. Miller's notes indicate that Plaintiff continued to have nightmares and flashbacks thereafter. Id. at 642 (May 29, 2018). Throughout this treatment period, Plaintiff had GAF scores ranging from 49 to 58, with one notation of 61-70, and highest GAF scores in the last twelve months noted as 62. Id. at 462 (4/24/18 – initial evaluation current GAF 58, highest 62), 464 (5/7/18 – GAF 61-

---

speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id.

The more recent DSM 5, which went into effect on May18, 2013, eliminated reference to the GAF score.  However, the Commissioner continues to receive and consider GAF scores in medical evidence, see Administrative Message-13066 (July 22, 2013), and an ALJ must consider a GAF score with all of the relevant evidence in the case file.  Nixon v. Colvin, 190 F.Supp.3d 444, 447 (E.D. Pa. 2016)).

[16]During the admission at Brooke Glen, Plaintiff tested positive for amphetamines. Tr. at 400.  Plaintiff admitted to occasional cannabis use and stated that the amphetamine was from her diet pills.  Id.

70), 642 (5/29/18 – current 51, highest 62), 644 (5/8/18 – current 56, highest 62), 645 (5/12/18 – current 49, highest 62).[17]

There is a gap in treatment notes from Berkshire Psychiatric from May 12, 2018 until March 4, 2019, when Plaintiff saw therapist Rebecca Malfaro, CRNP. Tr. at 1017. Ms. Malfaro noted that Plaintiff had increased depressive symptoms, tearfulness, and sleep disturbance. Id.[18] In April, Plaintiff was prescribed Prozac, Rexulti, and Ativan,[19] id. at 1015, and a few weeks later Rexulti was discontinued due to an increase in aggression, tearfulness and anxiety. Id. at 1014. On May 22, 2019, Ms. Malfaro indicated that Plaintiff was doing well with decreased anger and irritability. Id. at 1013. In the final treatment note in the record for June 10, 2019, Ms. Malfaro noted that Plaintiff was "crying everyday," suffering from mood lability, poor sleep and appetite,

---

[17]A GAF score of 41-50 indicates "[s]erious sympoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV-TR, at 34. A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) [or] some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Id.

[18]In the interim, Dr. Migliarino's notes from February 15, 2019, indicate that Plaintiff's anxiety and depression are well controlled by her medication regimen. Tr. at 881.

[19]Prozac is an antidepressant used to treat MDD, obsessive-compulsive disorder, panic disorder, and premenstrual dysphoric disorder. See https://www.drugs.com/prozac.html (last visited Sept. 8, 2021). Rexulti is an antipsychotic medication used to treat the symptoms of schizophrenia or with other medications to treat MDD. See https://www.drugs.com/rexulti.html (last visited Sept. 8, 2021). Ativan (generic lorazepam) is used to treat anxiety disorders. See https://www.drugs.com/ativan.html (last visited Sept. 8, 2021).

and increased panic attacks.  Id. at 1012.  Ms. Malfaro consistently found that Plaintiff

had a GAF score of 41-50.  Id. at 1016 (3/18/19), 1015 (4/24/19), 1014 (5/2/19).

Plaintiff also has a history of GERD which is "mostly" controlled with Nexium.[20]

Tr. at 427.  During the relevant period, she was also treated for esophageal dysphagia

(difficulty swallowing).  Id. at 426.  Plaintiff was diagnosed with mild narrowing of the

upper and middle sections of the esophagus.  Id. at 442-43.

In addition, Plaintiff treated with the Endocrinology and Diabetes Center for a low

TSH (thyroid stimulating hormone) level and for the nodules found on her thyroid that

were too small to biopsy.  Tr. at 483, 537-38, 543, 737, 811.[21]  Endocrinologist Vasudev

Magaji, M.D., concluded that Plaintiff's hyperthyroidism was due to either the thyroid

nodules or thyroiditis.  Id. at 550.  The doctor noted that the thyroid function test was

only "mildly abnormal," and she should have thyroid function tests every six weeks three

times.  Id.  Dr. Magaji also ordered a repeat of the thyroid ultrasound for the end of

2019.  Id. at 825.

Plaintiff was seen by Dr. Harkins on June 26, 2019, complaining of pelvic pain.

Tr. at 955-56.  Dr. Harkins noted that the recent recurrence of pelvic pain was caused by

---

[20]Nexium is a proton pump inhibitor that decreases the amount of acid produced in the stomach used to treat GERD.  See https://www.drugs.com/nexium.html (last visited Sept. 8, 2021).

[21]It appears that the nodules were discovered in March 2018.  Tr. at 815, 875.  In addition, the ultrasound performed on November 8, 2018, refers to a prior ultrasound of June 30, 2018, and the fact that the "2 left thyroid nodules [were] redemonstrated and unchanged."  Id. at 737.

a urinary tract infection, and he instructed her to continue with antibiotics.  Id. at 956.

Lab tests ordered by Dr. Harkins were negative.  Id. at 965.[22]

The administrative record also contains a number of medical and capacity

assessments completed by Plaintiff's treating physicians and others.  Dr. Migliarino,

Plaintiff's primary care physician, completed a Physical RFC Questionnaire on August

30, 2019, noting that Plaintiff suffers from depression, anxiety, fibromyalgia, and

endometriosis, which cause her chronic pain, sensitivity to cold, night sweats, IBS,

fatigue, diffuse joint pain, and difficulty with concentration.[23]  Tr. at 992-97.  Dr.

Migliarino opined that Plaintiff could sit and stand/walk for less than two hours each in

an eight-hour workday, and could sit for only one hour at a time and stand for only

twenty minutes at a time, with the ability to shift positions from sitting to standing at will.

Id. at 993-94.  She would also need the ability to walk for ten minutes every thirty

minutes.  Id. at 994.  The doctor also opined that Plaintiff could occasionally lift ten

pounds, rarely lift twenty pounds, and never lift fifty pounds, would be absent due to her

---

[22]Prior to Plaintiff's alleged disability onset date, she also treated with respiratory specialists for recurrent sinusitis, bronchitis and asthma.  Tr. at 284-324.  Those records evidence persistent asthma with acute exacerbations controlled with medication.  See id. at 309-12 (3/9/17 - asthma evaluation prescribed Breo, Singulair, Spiriva, and nebulized albuterol), 305-07 (3/29/17 – possible upper viral upper respiratory infection or early acute bronchitis treated with prednisone and Dymista), 287 (4/13/17 - "[l]ung volumes and diffusion capacity are normal"), 298 (6/1/17 – asthma flare treated with prednisone and Z-Pak, with samples of Breo Ellipta and Spiriva).  Plaintiff was also seen on October 5 and October 9, 2017, for an upper respiratory infection for which she was given Zithromax, Tessalon, and prednisone.  Id. at 325-26.

[23]It appears that Plaintiff assisted in the completion of the Questionnaire as two different handwritings appear on the form and some of the answers are written in the first person.  See, e.g., tr. at 992 ("the medicine makes me even more tired.").

impairments/treatment five to six days each month, and would have difficulty focusing 25% of the day due to a combination of her depression, anxiety, and pain.  Id. at 995-96.

Dr. Harkins, Plaintiff's gynecologist, completed a physician statement on February 23, 2018, indicating that Plaintiff was totally disabled beginning on February 3, 2018, due to pelvic pain and nerve pain.  Tr. at 565-67.[24]  At that point, Dr. Harkins stated that he did not know the duration of Plaintiff's limitations, but that she was disabled at least through February 27, 2018.  Id. at 567-68.  He noted that Plaintiff had limitations in working, bending, concentrating, lifting, reaching, standing, thinking and walking and indicated that Plaintiff could not lift more than ten pounds.  Id.

In addition, Vasundhara Kakodkar, M.D., conducted a consultative examination on November 9, 2018.  Tr. at 506-10.  The doctor noted a "crackling noise" when Plaintiff moved her knees, with no redness, heat, or effusion, and no trigger points for fibromyalgia, and found that her range of motion was normal in all joints, with a slight reduction in both knees.  Id. at 509, 519-22.  The doctor opined that Plaintiff's ability to lift and carry was limited by the pain in her knees and that she could lift continuously up to twenty pounds and occasionally up to 100 pounds, and carry continuously up to ten pounds and frequently up to twenty pounds.  Id. at 512.  She also opined that Plaintiff could sit for eight hours a day continuously, stand for eight hours a day in four-hour increments, and walk for five hours a day in one-hour increments.  Id. at 513.

---

[24]This assessment is contained a second time in the administrative record at pages 662-65.

Additionally, Dr. Kakodkar indicated that Plaintiff had no limitation in the use of her hands or feet, with postural limitations in her ability to climb stairs, ramps, ladders, and scaffolds, and kneel, crouch or crawl.  Id. at 514-15.  She should never be exposed to humidity and wetness, dust, odors, fumes, or other pulmonary irritants, or extreme cold. Id. at 516.

At the initial determination stage, Michael J. Brown, D.O., concluded from a review of Plaintiff's medical records that she could frequently lift and carry twenty-five pounds, occasionally lift fifty pounds, stand/walk for six hours and sit for six hours in an eight-hour workday.  Tr. at 108.  Dr. Brown also concluded that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  Id. at 108-09.

With respect to limitations related to Plaintiff's mental impairments, nurse practitioner Malfaro from Berkshire Psychiatric completed a Mental RFC Assessment on October 25, 2019, noting diagnoses of MDD, recurrent severe without psychotic features and chronic PTSD.  Tr. at 998-1002.  Ms. Malfaro opined that Plaintiff had moderate[25] limitations in the abilities to follow one-or-two step oral instructions; understand and learn work-like terms, instructions, and procedures; ask and answer questions and provide explanations; recognize a mistake and correct it; identify and solve problems;

---

[25]The Assessment provided a five-point scale, measuring the person's ability to function in the area independently, appropriately and effectively on a sustained basis.  Tr. at 999.  "None" indicates no limitations; "mild" indicates slight limitations that would cause the person to be off task 5% of the workday; "moderate" indicates the person's functioning is fair and the person would be off task 10% of the workday; "marked" indicates serious limitation causing the person to be off task 15% of the workday, and "extreme" indicates the person is not able to function in this area and would be off task 25% or more of the workday.  Id.

maintain socially appropriate behavior; initiate and perform a task she understands and knows how to do; ignore or avoid distractions; change activities or work settings; work close to or with others; sustain ordinary routine; respond to demands; adapt to changes; and manage psychologically based symptoms.  Id. at 999-1001.  Plaintiff had marked limitation in the abilities to sequence/complete multi-step activities; cooperate with others; state her point of view; initiate or sustain conversation; work a full day without needing more than the allotted number or length of rest periods.  Id.  In addition, Ms. Malfaro found Plaintiff had extreme limitations in the abilities to describe work activity to someone else; use reason and judgment; ask for help; handle conflicts; respond appropriately to requests, suggestions, and criticism; keep social interactions free from excessive irritability, sensitivity, argumentativeness, or suspiciousness; and interact appropriately with the public.  Id.

Amanda Kochan-Dewey, Psy.D., conducted a psychological consultative examination on November 9, 2018, with normal results on MSE, with the notation that Plaintiff's attention and concentration were intact overall, but impacted by nervousness in the evaluation and having to leave her children and pain.  Tr. at 495-98.  Dr. Kochan-Dewey diagnosed Plaintiff with unspecified depressive and anxiety disorders, and recommended that she resume psychological and psychiatric treatment.  Id. at 498.  The doctor found that Plaintiff had no limitations in most areas of work-related mental

functioning[26] and that she was mildly limited in her abilities to carry out complex

instructions and make judgments on complex work-related decisions.  Id. at 499.  The

doctor specifically noted that Plaintiff's impairments did not impact her abilities to

concentrate, persist, maintain pace, or adapt or manage oneself.  Id. at 500.

At the initial consideration stage, John Gavazzi, Psy.D., found from a review of

the records that Plaintiff suffered from depressive, bipolar, and related disorders, and

anxiety and obsessive-compulsive disorders, which caused mild limitation in Plaintiff's

abilities to understand, remember, or apply information and concentrate, persist, or

maintain pace; and no limitation in her abilities to interact with others and adapt or

manage oneself.  Tr. at 106-07.

### D.    **Plaintiff's Claims**

#### 1.    Medical Opinion Evidence

Plaintiff claims that the ALJ failed to accord proper weight to the opinion of

Plaintiff's treating sources, arguing that her treating physicians' opinions are entitled to

controlling weight and that the ALJ failed to evaluate the opinions with the factors set

forth in the governing regulation.  Doc. 11 at 20-25 (citing 20 C.F.R. § 404.1527).

Defendant responds that the Plaintiff's argument is based on regulations inapplicable to

her case and that the ALJ adequately explained his reasoning concerning the opinion

evidence pursuant to the applicable regulations.  Doc. 14 at 6-8.

---

[26]The form Dr. Kochan-Dewey completed also had a five-point scale ranging from none to extreme with definitions similar to those applicable to the assessment completed by Ms. Malfaro.  Tr. at 499.

Before addressing Plaintiff's challenge to the ALJ's consideration of the medical opinion evidence, I must first address the regulatory scheme governing such consideration. Plaintiff is relying on the regulations that govern the consideration of medical opinion evidence for claims filed prior to March 27, 2017. However, Plaintiff filed her application on September 13, 2018. The new regulations, which apply to claims filed on or after March 27, 2017, focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.

20 C.F.R. § 404.1520c(a).[27] The regulations list the factors to be utilized in considering medical opinions: supportability, consistency, relationship including the length and purpose of the treatment relationship and frequency of examinations, specialization, and other factors including familiarity with other evidence in the record or an understanding of the disability program. Id. § 404.1520c(c). The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain these factors, but do not require discussion of the others. Id. § 404.1520c(b)(2). The regulations explain that "[t]he more relevant the medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinion . . . will be." Id. § 404.1520c(c)(1). In addition, "[t]he more consistent a medical opinion . . . is with the evidence from other

---

[27]In contrast, the previously applicable regulations spoke in terms of the weight to be given each opinion, including controlling weight for the opinions of certain treating sources. 20 C.F.R. § 404.1527.

medical sources and nonmedical sources . . . , the more persuasive the medical opinion . . . will be."  Id. § 404.1520c(c)(2).

The limitations contained in each of the assessments were set forth earlier in this memorandum.  See supra at 13-17.  With respect to Dr. Harkins' statement of disability, tr. at 565-68, the ALJ did not find the opinion persuasive.  Id. at 27.

> It largely presents vague limitations, and it only clarifies the lifting limitation.  Even if the record did support that [Plaintiff] could only lift 10 pounds, this would still not be disabling.  Dr. Harkins had no recent physical examination of [Plaintiff] prior to this assessment and it is not consistent with [Plaintiff's] later treatment.  Dr. Harkins reported at their single treatment visit in June 2019 [id. at 955-65] that [Plaintiff] had not been seen since November 2017 [id. at 947], when [Plaintiff] had deferred a physical examination.

Id. at 27-28.

I find no error with respect to the ALJ's consideration of this opinion.  Dr. Harkins completed the form on February 23, 2018, attesting to the fact that Plaintiff was disabled from February 3 to at least February 27, 2018.  Tr. at 566-67.  The doctor's treatment notes do not support disability for this period for the simple reason that there are no treatment notes for this period.  In the form, the doctor indicates that he saw Plaintiff on five occasions since June 12, 2017, with the last time on November 27, 2017, almost three months prior to the date of his opinion.  Id. at 565.  Of these five visits, the record contains only Dr. Harkins' notes from the November 27, 2017 visit, id. at 947, at which time the doctor prescribed gabapentin and advised Plaintiff that it would take 4-6 weeks to notice an effect.  Id.  Therefore, the record is devoid of support for Dr. Harkins' opinions.  Moreover, as will be discussed, Dr. Harkins' assessment of disability is

inconsistent with the evidence as a whole, including the examinations conducted by

Plaintiff's primary care physician and the consultative examiner.

With respect to Dr. Migliarino's assessment, the ALJ also found that the opinion

was not persuasive.  Tr. at 28.

> Understandable it is hard to quantify pain, however,
> [Plaintiff's] physical examinations with Dr. Migliarino are
> routine.  Nothing in this opinion cites any objective or clinical
> evidence noted in the record.  [Plaintiff] was never noted to
> be in pain or distress on exam with Dr. Migliarino ([tr. at 873-
> 942]).  Dr. Migliarino is [not] a specialist, this is not a
> dispositive factor, but the undersigned notes that the
> rheumatologist did not diagnose [Plaintiff] with fibromyalgia
> that Dr. Migliarino treated [Plaintiff] for (id. at 569-617]) and
> Dr. Harkins did not note endometriosis as an active diagnosis
> ([id. at 565-68, 943-68]).  This supports the conclusion that
> this opinion is based more on subject[ive] allegations than
> objective records review.  Additionally, it is clear that some
> of this form is filled out by [Plaintiff], as it is written in the
> first person.  [Plaintiff] did not see Dr. Migliarino from April
> to November 2018 or from February 2019 to May 2019 ([id.
> at 873-942]); the undersigned finds the frequency of these
> visits consistent with chronic but not severe pain.

Id. at 28.

Again, I find no error with the ALJ's discussion and conclusion.  Review of Dr.

Migliarino's treatment notes, specifically his examination notes, do not establish any

persistent tenderness or pain response.  See tr. at 889, 926 (8/21/19 – non-tender

abdomen, extremities normal), 886-87, 923-24 (6/21/19 – moderate suprapubic

tenderness – suspected urinary tract infection, extremities normal), 884, 921 (5/20/19 –

abdomen non-tender, extremities normal), 881-82, 918-19 (2/15/19 – abdomen non-

tender, extremities normal), 878, 916 (12/28/18 – same), 877, 914 (11/29/18 – abdomen

non-tender, moderate tenderness without swelling of left calf), 482, 874, 911 (11/8/18 –

abdomen non-tender, extremities normal), 479 (4/28/18 – same), 473 (2/6/18 – same).

Thus, Dr. Migliarino's opinion regarding diffuse joint pains is inconsistent with his own

examination records.  In addition, as noted by the ALJ, it appears that Plaintiff completed

parts of the assessment as different handwriting appears on the form and parts are written

in the first person.  Id. at 992.

Moreover, the assessments completed by Drs. Migliarino and Harkins are

inconsistent with the findings of Dr. Kakodkar, the consultative examiner, whose

examination was normal, but for notations of "crackling noise" with movement of both

knees, consistent with osteoarthritis, tr. at 508-09, and Dr. Brown's conclusions after his

review of the record.

With respect to Ms. Malfaro's mental assessment, the ALJ found the assessment

unpersuasive, noting that it was internally inconsistent as well as inconsistent with her

own treatment notes.

> [Plaintiff's] therapist noted that [Plaintiff] had a [GAF] score
> range of 50 to 60 under her current diagnoses, 70 to 75 under
> her highest scores of the year, and a current score of 55 to 60.
> Ms. Malfaro went on to note 5 mild, 14 moderate, 5 marked,
> [and] 7 extreme [limitations].  Most marked and extreme
> limitations were under the heading of interacting with others.
> Ms. Malfaro wrote at the end that [Plaintiff] could possibl[y]
> work depending if [Plaintiff] could work at her own pace.
> The undersigned finds this opinion to be unpersuasive,
> because it is internally inconsistent.  Despite stating that
> [Plaintiff] was a patient from April 2018, Ms. Malfaro was
> only treating [Plaintiff] from March to August 2019.  Over
> these 6 months, Ms. Malfaro stated that [Plaintiff's] [GAF]
> score ranged from 50 to 75, her own forms would indicate
> this equates to no more than moderate limitations.

> Additionally, over the period of review, [Plaintiff] had 6
> months or more at a time without any mental health
> treatment, and did not have any emergency room care,
> something inconsistent with an individual with so many
> moderate to extreme limitations.  [Plaintiff's] single inpatient
> hospitalization was noted to be both when [Plaintiff] reported
> she was not taking her medication ([tr. at 673]) and when she
> had tested positive for non-prescribed amphetamine and
> marijuana ([id. at 400]).

Id. at 28-29.

Although I agree that Ms. Malfaro's assessment seems to be internally

inconsistent, finding several marked or extreme limitations but noting that Plaintiff might

be able to work depending on the ability to work at her own pace, the ALJ's

consideration of Ms. Malfaro's opinion is flawed.  One of the reasons the ALJ did not

find Ms. Malfaro's assessment persuasive was that he found it inconsistent with her own

treatment notes, which, according to the ALJ, contained GAF scores ranging from 50 to

75, indicating no more than moderate limitations.  Contrary to this statement, Ms.

Malfaro's notes establish that during Plaintiff's therapy sessions, Ms. Malfaro

consistently found that Plaintiff had GAF scores ranging from 41-50, indicating serious

symptoms.  See tr. at 1016 (3/18/19), 1015 (4/24/19), 1014 (5/2/19).  This is also

consistent with the decrease in GAF scores noted by Plaintiff's prior therapist Mr. Miller.

See id. at 462 (4/24/18 – current GAF 58, highest in last year 61), 453 (5/8/18 – 56 and

62), 454 (5/12/18 – 49 and 62), 452 (5/29/18 – 51 and 62).[28]  When there is a conflict in

---

[28]At the time Ms. Malfaro completed the assessment form in October 2019, she
indicated that Plaintiff's then-current GAF score was 55-60 and the highest in the year
was 70-75.  Tr. at 998.

the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as he does not "reject evidence for no reason or for the wrong reason." E.g., Brown v. Astrue, 649 F.3d 193, 196-97 (3d Cir. 2011) (citation omitted); Rutherford v. Barnhart, 399 F.3d 546, 554 (3dCir. 2005); Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1991).[29]   Here, one of the bases the ALJ gave for finding Ms. Malfaro's assessment less persuasive was based on a misreading or misconstruction of her treatment notes. Because supportability is one of the hallmarks governing consideration of opinion evidence, the ALJ's error was material to his consideration of the assessment Ms. Malfaro provided.  Thus, I will remand the case for further consideration of Plaintiff's mental health treatment evidence.  If reconsideration of that evidence results in any change to Plaintiff's RFC, the ALJ should also obtain additional vocational testimony.

    2.    RFC Assessment

    Plaintiff next argues that the ALJ erred by failing to consider the limitations imposed by all of her severe and non-severe impairments in the RFC assessment.  Doc. 11 at 11-20.  Defendant responds that the ALJ's RFC assessment sufficiently accommodates the limitations imposed by Plaintiff's severe and non-severe impairments. Doc. 14 at 3-6.

---

[29]Although these cases were decided prior to the regulatory change abandoning the concept of evidentiary weight in favor of persuasiveness based on the supportability of the opinion and its consistency with the record as a whole, the theory that the ALJ may not reject an opinion based on a flawed reading of the record is equally applicable under the new regulatory scheme.  See Pasquini v. Saul, Civ. No. 20-243, 2021 WL 199355, at *6 & n.3 (M.D. Pa. Jan. 20, 2021) (finding error in discounting treating physician's opinion under both regulatory schemes governing consideration of opinion evidence "because it is the explanation provided that is defective").

Because I have determined that the case must be remanded for further consideration of the mental health treatment evidence, including the assessment completed by Plaintiff's therapist, Ms. Malfaro, which may alter the RFC assessment, I find it unnecessary to address this claim further.  However, certain aspects of Plaintiff's argument merit comment.

In her brief, Plaintiff seems to lose sight of the fact that the ALJ is required to include only those limitations that are "credibly established," not all of the limitations alleged by Plaintiff.  Covone v. Comm'r of Soc. Sec., 142 F. App'x 585, 587 (3d Cir. 2005) (citing Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002).  Moreover, an ALJ may reject claims of disabling pain and other symptoms where he has considered the subjective complaints and specified reasons for rejecting such claims based on the record evidence.  Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 199)).  Plaintiff's argument that the ALJ failed to include additional limitations in the RFC assessment is based primarily on Plaintiff's own testimony.  Doc. 11 at 13, 17-18.  In his decision, the ALJ explained that Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were inconsistent with the lack of significant treatment records, Dr. Migliarino's examination notes and notes of Plaintiff's complaints, and the normal physical examination by the consultative examiner.  Tr. at 27.  Although reconsideration of the mental health treatment evidence may affect the ALJ's consideration of Plaintiff's subjective complaints, the factors considered by the ALJ in this decision were appropriate.

Plaintiff also argues that the ALJ failed to consider "the diagnosis for [sic] and treatment of numerous severe physical health conditions."  Doc. 11 at 13.  Plaintiff lists a total of seventeen diagnoses that she claims the ALJ failed to consider in determining her RFC.  Doc. 11 at 13.  The mere diagnosis of an impairment is not sufficient to establish disability.  Petition of Sullivan, 904 F.2d 826, 845 (3d Cir. 1990).  Instead, the plaintiff must establish the functional limitations associated with the impairment.

To the extent Plaintiff complains that the ALJ did not include all of the limitations included in the assessments provided by Drs. Migliarino and Harkins, see Doc. 11 at 14, I have addressed those assessments earlier in this memorandum.  In addition, Plaintiff suggests that the ALJ erred in failing to engage the assistance of a medical expert or obtain a consultative exam regarding the allegedly disabling nature of Plaintiff's endometriosis.  Doc. 11 at 18-19.  Plaintiff is incorrect.

The assistance of a medical expert was not necessary in the circumstances presented in this case.

> Social Security Ruling 96-6p (1996) provides that an ALJ must obtain an  updated medical opinion from a medical expert if, and only if, the ALJ believes that "the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or [w]hen additional medical evidence is received that in the opinion of the [ALJ] may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."  These authorities accord an ALJ broad discretion in determining whether to consult with a medical expert . . . .

Hardee v. Comm'r of Soc. Sec., 188 F. App'x 127, 129 (3d Cir. 2006) (quoting Social

Security Ruling ("SSR") 96-6p, Policy Interpretation Ruling Title II and XVI:

Consideration of Administrative Findings of Fact by State Agency Medical and

Psychological Consultants and Other Program Physicians and Psychologists at the [ALJ]

and Appeals Council Levels of Administrative Review; Medical Equivalence, 1996 WL

374180, at *4 (July 2, 1996)).[30]   The ALJ adequately explained his consideration of

Plaintiff's endometriosis, noting that she had a total hysterectomy in June 2017, prior to

her alleged onset date.  Tr. at 20.  She did not consult her gynecologist for any related

symptoms from late November 2017 to June 2019, when she complained of worsening

pain.  Dr. Harkins concluded that this was likely due to a recent urinary tract infection.

Id. at 20; see also id. at 956 ("recurrence of pelvic pain . . . likely . . . exacerbated by a

recent urinary tract infection").  Because there was no basis to require the assistance of a

medical expert, there is no error.  Similarly, the regulations allow the ALJ to obtain a

consultative examination to resolve an inconsistency in the evidence or "when the

evidence as a whole is insufficient to allow us to make a determination or decision on

[the] claim."  20 C.F.R. § 404.1519a(b).  Here, there is no inconsistency and the ALJ

---

[30]The ALJ must also "call on the service of a medical advisor when [the] onset
[date] must be inferred" in the case of a "slowly progressive impairment."  Monroy v.
Saul, Civ. No. 18-5638, 2020 WL 4500045, at *6 (D.N.J. Aug. 5, 2020) (quoting Social
Security Ruling 83-20, Titles II and XVI:  Onset of Disability, 1983 WL 31249, at *3
(1983) and citing Welsh v. Comm'r of Soc. Sec., 662 F. App'x 105, 108 (3d Cir. 2016)).
Because Plaintiff's case does not raise an issue of disability onset date or involve a
slowly progressive impairment, this provision is not applicable.

adequately explained his consideration of Plaintiff's endometriosis.  Thus, I find no error in the ALJ's determination in this respect.

IV.  **CONCLUSION**

The ALJ's consideration of the mental health assessment provided by Plaintiff's treating therapist was flawed, requiring reconsideration of the mental health treatment evidence and Ms. Malfaro's assessment specifically.  Reconsideration of this evidence may impact the ALJ's consideration of Plaintiff's subjective complaints and her RFC assessment.  Therefore, I will remand the case for further consideration and additional vocational testimony if warranted.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HEATHER LYNN LOVE | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  20-5221 |
| Commissioner of Social Security | : | |

## **O R D E R**

AND NOW, this    27th     day of September, 2021, upon consideration of

Plaintiff's request for review (Doc. 11), the response (Doc. 14), and after careful

consideration of the administrative record (Doc. 10), IT IS HEREBY ORDERED that:

1.  Judgment is entered REVERSING the decision of the Commissioner of
    Social Security for the purposes of this remand only and the relief sought
    by Plaintiff is GRANTED to the extent that the matter is REMANDED for
    further proceedings consistent with this adjudication; and

2.  The Clerk of Court is hereby directed to mark this case closed.


BY THE COURT:


/s/ Elizabeth T. Hey
ELIZABETH T. HEY, U.S.M.J.